**WOODHOUSE DRAKE & CAREY (TRADING), INC., Plaintiff,**

v.

**S. S. "HELLENIC CHALLENGER", her engines, boilers, etc., and Hellenic Lines Limited, Defendant.**

**No. 78 Civ. 2923.**

United States District Court, S. D. New York.

June 8, 1979.

Dwyer & Peltz, New York City, for plaintiff; Alexander Peltz, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant; M. E. DeOrchis, Vincent M. DeOrchis, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff, Woodhouse Drake & Carey (Trading), Inc., the consignee of a shipment of 6,834 bags of Uganda Robusta Coffee, seeks recovery of damages for 125 bags delivered slack or short, torn and mended from the carrier, Hellenic Lines Ltd., under the Carriage of Goods by Sea Act ("COG-SA").[1] On June 6, 1977, at Mombasa, the cargo was loaded on board the S.S. Hellenic Challenger for delivery to New York. Fifteen bills of lading were issued free of any notations or exceptions regarding the apparent good order and condition of the bags of coffee. Each bill also noted that the shipment was "said to weigh," totalling in all, 414,856 kilos gross (approximately 134 lbs. per bag). The vessel arrived at Hellenic's pier in New York City on July 16, 1977. Following discharge, 125 bags of coffee

---

1. 46 U.S.C. §§ 1300 et seq.

were set aside as torn and slack. An independent certified weigher, W.S. Force & Co., Inc., weighed each of the 125 bags individually. Based on the average gross weight of 134 lbs. per bag indicated on the bill of lading and the actual weight of each bag on discharge, the weigher determined that the 125 damaged bags in all were 3,922 lbs. short. The instant suit followed.

■ Plaintiff establishes a prima facie case under COGSA by proof of delivery of the cargo to the carrier in good order and its outturn at destination in damaged condition.[2] The burden then shifts to the carrier to prove "(1) that the harm resulted from an 'excepted cause' for which the carrier was not liable, or (2) that it exercised due diligence to avoid and prevent the harm."[3]

Plaintiff relies on the clean bill of lading and the weights stated therein "[as] prima facie evidence of the receipt by the carrier of the goods as . . . described" in the bill.[4] To prove bad order on outturn, plaintiff offers the weight certificates of W.S. Force & Co. indicating the above-noted shortage of 3,922 lbs. of coffee. While defendant does not challenge the weights found on discharge, it contends that the 134 lbs. per bag weight declared in the bill of lading is only an estimated weight and that plaintiff, to show good order on delivery to the carrier, must provide accurate scaled weights per bag made at the port of loading. It further argues that Hellenic Lines had no means of verifying the weight of the bags of coffee at Mombasa.

■ COGSA provides the answer to defendant's contention. Section 1303(3) provides:

> After receiving the goods into his charge the carrier, or the master or agent of the carrier, shall, on demand of the shipper, issue to the shipper a bill of lading showing among other things—
>
> . . .
>
> (b) Either the number of packages or pieces, or the quantity or weight, as the case may be, as furnished in writing by the shipper.
>
> (c) The apparent order and condition of the goods: *Provided*, That no carrier, master, or agent of the carrier, shall be bound to state or show in the bill of lading any . . . quantity, *or weight* which he has reasonable ground for suspecting not accurately to represent the goods actually received, or which he has had no reasonable means of checking. (Emphasis supplied)

As our Court of Appeals has said of this section: "[The Act] specifically provides a method for avoiding carrier liability for false information given by the shipper, by not stating it in the bill. . . . The carrier must utilize that method, rather than the quite general reservation attempted here."[5] Thus if defendant had reason to doubt the shipper's weights, it was required to use the method for limiting liability expressly provided by COGSA and cannot now advance the general statement in the bills, "said to weigh," against the consignee. Since plaintiff relied on the weights specified in the bills in purchasing the consignment, defendant is estopped from denying

---

2. *Vana Trading Co. v. S. S. "Mette Skou,"* 556 F.2d 100, 104 (2d Cir.), *cert. denied,* 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977); *Travelers Indem. Co. v. SS Polarland,* 418 F.Supp. 985, 987 (S.D.N.Y.1976), *aff'd mem.,* 562 F.2d 39 (2d Cir. 1977); *American Tobacco Co. v. The Katingo Hadjipatera,* 81 F.Supp. 438, 445 (S.D.N.Y.1948), *aff'd,* 194 F.2d 449 (2d Cir. 1951), *cert. denied,* 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952).

3. *General Foods Corp. v. The Troubador,* 98 F.Supp. 207, 209 (S.D.N.Y.1951); *accord, Schnell v. The Vallescura,* 293 U.S. 296, 303, 55 S.Ct. 194, 79 L.Ed. 373 (1934); *see* 46 U.S.C. § 1304(2), (3).

4. 46 U.S.C. § 1303(4); *see Portland Fish Co. v. States Steamship Co.,* 510 F.2d 628, 633 (9th Cir. 1974); *Demsey & Associates v. S. S. Sea Star,* 461 F.2d 1009, 1015 (2d Cir. 1972); *Spanish American Skin Co. v. The Ferngulf,* 242 F.2d 551, 553 (2d Cir. 1957).

5. *Spanish American Skin Co. v. The Ferngulf,* 242 F.2d 551, 553 (2d Cir. 1957); *accord, Portland Fish Co. v. States Steamship Co.,* 510 F.2d 628, 633 (9th Cir. 1974); *cf. American Trading Co. v. The Harry Culbreath,* 187 F.2d 310, 313 (2d Cir. 1951) (shipper was agent of consignee).

the accuracy of the description contained therein.[6]

■ Even beyond the presumption of accuracy provided by the bill, however, plaintiff has established the weight of sound bags of coffee to the satisfaction of the Court. W.S. Force & Co., in addition to weighing the slack bags, also performed a test sampling of ten percent of the sound bags. The average gross weight per bag was 132 lbs., closely approximating the stated weight in the bills less the one percent "franchise loss" or variance between weight at loading and weight at discharge accepted by the custom in the industry.

■ Plaintiff having established its prima facie case of liability, the burden shifts to defendant to show due diligence or that the loss occurred from an excepted cause. No evidence of due care in the loading, stowage and handling of the cargo was proffered.[7] Defendant's alternative contention that the damage was caused by "insufficiency of packing"[8] has no evidentiary support. The testimony offered by defendant of the condition of burlap bags in which Ugandan coffee beans are packaged concerned a different cargo shipped on a different vessel. No evidence concerning the packaging of this cargo was offered. Moreover, it is significant that defendant, despite repeated requests to do so, failed to produce at trial its records pertaining to the loading of this shipment, which records might have shed light on the issues presented. Defendant has failed to sustain the burden of proof on its defenses.

■ On the issue of damages, the weight certificates show the actual weight of the 125 slack bags as 12,828 lbs. The weigher's determination of 3,922 lbs. slackage, however, was based on an assumed weight at port of loading of 134 lbs. per bag or 16,750 lbs. for the 125 damaged bags. But the actual weight of the sound bags at discharge, according to the test sampling, was approximately 132 lbs. per bag, presumably due to the customary one percent "franchise loss" through ordinary seepage of beans through the bags or shrinkage of the beans themselves. It is appropriate to assume then that if the 125 bags had not been damaged they would also have weighed 132 lbs. per bag; the carrier is not chargeable with a loss that would have occurred in any event. The total slackage then is 3,672 lbs. (125 bags × 132 lbs. − 12,828 lbs.). The sales price of the cargo to plaintiff adequately establishes the fair market value of the cargo at the port of discharge.[9] At $1.90 per pound, the loss to

---

6. *Portland Fish Co. v. States Steamship Co.*, 510 F.2d 628, 633 (9th Cir. 1974); *see Demsey & Associates v. S. S. Sea Star*, 461 F.2d 1009, 1015 (2d Cir. 1972).

7. 46 U.S.C. § 1304(2)(q) ("the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage.")

8. *Id.* § 1304(2)(n). Compare *Scarburgh v. Compania Sud-American De Vapores*, 174 F.2d 423 (2d Cir. 1949) in which the testimony of the cooper for the cargo in question was offered to establish that mouths of the coffee bags were secured by twine of insufficient strength. Here in contrast the testimony with respect to packaging in reused bags with defective machine stitching concerned cargo shipped on a different vessel.

9. *Emmco Ins. Co. v. Wallenius Caribbean Line, S.A.*, 492 F.2d 508, 514 (5th Cir. 1974); *Empresa Central Mer. De R. v. Republic of U. S. of Brazil*, 257 F.2d 747, 749 (2d Cir. 1958); *Tatlow & Pledger (PTY), Ltd. v. Hermann Forwarding Co.*, 456 F.Supp. 351, 355 (S.D.N.Y.1978); *Dixie Plywood Co. v. S. S. Federal Lakes*, 404 F.Supp. 461, 465 (S.D.Ga.), *aff'd*, 525 F.2d 691 (5th Cir. 1975), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2174, 48 L.Ed.2d 798 (1976).

Although plaintiff attempted to establish at trial the fair market value at New York in July 1977 for Robusta coffee beans at $2.075 per pound, the claim it originally submitted to defendant was based on the invoice price of $1.90 per pound. The source for the $2.075 per pound valuation is the "Complete Coffee Coverage," a market quotation sheet issued daily by George Gordon Paton & Co., Inc. of New York. Although the proffered evidence concerns the relevant time period, *i. e.*, July 1977, it offers a range of prices for coffee beans of the type at issue here. For example, $2.06 "exdock" for "Ugandas, FAQ, instore, spot, and afloat"; $1.97–$1.98 FOB for "July/Aug. shipment FAQ Ugandas"; and $2.075 for "Robusta" on the "ICO's daily coffee indicator." There is insufficient evidence in the record to

plaintiff for 3,672 lbs. is $6,976.80, plus interest to be computed from date of discharge at six percent per annum.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

Submit judgment in accordance with the foregoing.

place the beans at issue at any particular point within this price range and the Court therefore adopts the invoice price as the measure of value.