**J. ARON & COMPANY**

v.

**CARGILL MARINE TERMINAL, INC. d/b/a Cargill Marine Cargo Carriers, et al.**

No. CIV. A. 94–1696.

United States District Court, E.D. Louisiana.

March 18, 1998.

Joseph W. Looney, Marisa Bascope, Adams & Reese, New Orleans, LA, Alfred E. Yudes, Jr., Watson, Farley & Williams, New York, NY, for J. Aron & Co.

John Francis Fay, Jr., William E. O'Neil, Earl S. Eichin, Jr., Marva Jo Wyatt, O'Neil, Eichin, Miller, Saporito & Harris, New Orleans, LA, for Cargill Marine Terminal, Inc.

Edward Joseph Koehl, Jr., Scott Allen Decker, Jones, Walker, Waechter, Pointevant, Carrere & Denegre, New Orleans, LA, for American River Transp. Co.

Donald L. King, Jones, Walker, Warchter, Pointevant, Carrere & Denegre, New Orleans, LA, for American Commercial Barge Line Co.

Scott Rodgers Wheaton, Jr., Lugenbuhl, Burke, Wheaton, Peck, Rankin & Hubbard, New Orleans, LA, Daryl G. Sohn, Goldstein & Price, St. Louis, MO, for Peavey Co., ConAgra, Inc.

### ORDER AND REASONS

MENTZ, District Judge.

Plaintiff J. Aron & Company brought this suit against American Commercial Barge Line Company ("ACBL") for damages due to the alleged deterioration and infestation of four barge loads of corn. The barges were delayed on the Mississippi River for several weeks when the United States Coast Guard closed the river to navigation from July 2, 1993 to October 1, 1993 due to extensive flooding in the Midwest. Depending on the different times each of the barges was loaded, the loading to discharge took from 70 to 121 days. Normally, it would have taken approximately 20 days to transport the cargos to their destination.

The court addresses here the cross-motions for summary judgment filed by J. Aron and ACBL. At issue is the liability of ACBL

as carrier pursuant to (1) the insured bills of lading issued on its behalf and (2) the Harter Act, 46 U.S.C.App. §§ 190–96. For the following reasons, the court finds that summary judgment in favor of defendant ACBL is warranted.

### 1. *Insured Bills of Lading*

█ J. Aron alleges that the sellers of the cargo purchased insured bills of lading from ACBL pursuant to which ACBL was obligated to provide "all risk" insurance. Because ACBL did not purchase insurance, J. Aron contends that ACBL is self-insured to pay for the loss in this case. J. Aron argues that the loss in this case is covered pursuant to the National Grain and Feed Association (NGFA) Barge Trade Rules, which set forth the minimum requirements for a "Cargo Insured Bill of Lading." According to J. Aron the loss was caused by flood, an Act of God, and/or ACBL's failure to care for the cargo during the delay by ventilating it.

Under NGFA Barge Trade Rule 11,[1] the seller in a CIF[2] contract is obligated to furnish cargo insurance or a cargo insured bill of lading. It is undisputed that two of the bills of lading issued on behalf of ACBL declared "Cargo Insured By Carrier;" the other two bills of lading did not. It is also true that ACBL did not procure insurance for the grain.

Under NGFA Barge Trade Rule 10, the risk of loss on a CIF contract passes to the buyer at the time and place of shipment. In addition, the members of the NGFA are free to vary the terms of the Barge Trade Rules by contract. The preamble to the rules provides that all members "are free to agree upon any contractual provisions which they deem appropriate and these rules apply only to the extent that the parties to a contract have not altered the terms of the rules, or the contract is silent as to matter dealt with by the pertinent rule."

ACBL's "Cargo Insured" bills of lading incorporate a contract of affreightment. Clauses 15 and 17 address the rights and obligations of the carrier for liability for cargo damage:

> 15. CARGO LIABILITY: Liability is assumed for general average, salvage charges and *physical damage to or loss of the shipment howsoever occurring (including but not limited to* fire, explosion, marine perils and *Acts of God); provided that the carrier shall not be liable for delay in the delivery of the shipment, or for loss of, damage to, or any expense in connection therewith, caused directly or indirectly by or resulting from or arising out of; shrinkage, expansion, or other change due to natural causes; any vice or defect in the shipment;* the act or default of the Shipper or owner; insufficiency of packing; *improper stowage, or the physical act of loading or unloading, when not performed by Carrier;* the authority of law; including without limitation, quarantine and embargo; or the acts of the public enemy, hostilities or warlike operations, whether or not there be a declaration of war.

(Emphasis added).

> 17. FORCE MAJEURE: Except as provided in Article 8 hereof, *neither party shall be liable for any loss or damage or from failure to perform or for delays in performance resulting from and occa-*

---

1. NGFA Barge Trade Rule 11 provides:
   **Rule 11. Cargo Insurance or Cargo Insured Bill of Lading:** The terms "Cargo Insurance" or "Cargo Insured" bill of lading as used in these rules shall mean—protection afforded to the holder of title of not less than that described as follows: For all physical loss and/or damage to the cargo for any and all risks or perils (including but not limited to all Acts of God); provided that, there need not be protection for 1) shrinkage, expansion, or other change to sound grain due to natural causes on sound grain; 2) loss, damage or deterioration resulting from delay in the delivery of the shipment and/or moisture content of the cargo itself; 3) any inherent vice or defect in the cargo; 4) improper stowage, or the physical act of loading or unloading, when not performed by carrier; 5) the authority of law, including without limitation, quarantine and embargo; or 6) the acts of the public enemy, hostilities, or war-like operations, whether or not there be a declaration of war.

2. Abbreviation for "cost, insurance, and freight." In accordance with CIF terms, the price of a sales contract includes the price of the goods, the insurance cost for the goods, and the costs of shipping the goods to the purchaser. *See C. Itoh & Co. v. M/V HANS LEONHARDT,* 719 F.Supp. 479, 484 n. 4 (E.D.La.1989).

*sioned by ... Acts of God or the elements, river or lock outages, perils or accidents of the sea or other water, ...or any other cause whatsoever beyond the control of the respective parties, whether the kind enumerated or otherwise.*

(Emphasis added).

These terms of the contract of affreightment, rather than the Barge Trade Rule, control ACBL's liability for cargo damage. The court further finds as a matter of law that the contract of affreightment excludes liability for the loss in this case. There are no genuine issues of material fact to dispute that due to the inherent nature of grain, the cargos deteriorated during the delay in delivery which was caused by the flooding. Clause 15 of the contract of affreightment clearly excludes liability for damage caused directly or indirectly by or resulting from or arising out of change due to natural causes in connection with delay in delivery of shipment. There is no dispute that this grain deteriorated as a result of natural processes of temperature and moisture on the cargo. It is further undisputed that the moisture conditions were not caused by any water penetration of the barge.

The same clause also excludes liability for any vice or defect in the shipment. The legal definition of inherent vice is any existing defect, disease, decay or the inherent nature of the commodity which will cause it to deteriorate with a lapse of time. *See Missouri Pacific R.R. v. Elmore & Stahl,* 377 U.S. 134, 136, 138–39, 84 S.Ct. 1142, 1143, 12 L.Ed.2d 194 (1964); *Vana Trading Co., Inc. v. S.S. Mette Skou,* 556 F.2d 100, 104 (2nd Cir.), *cert. denied,* 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977) (citation omitted). There are no genuine issues of material fact to dispute that the inherent nature of the grain caused it to deteriorate with the lapse of time.

Arguably, liability is also excluded under Clause 15 for improper stowage. The contract of affreightment provided in Clause 10 that "proper loading and unloading shall be the Shipper's responsibility." In this case, three of the four barges were loaded after the river closure. To the extent that J. Aron argues that the cargo should have been off loaded to ventilate the cargo during the delay, that duty would not lie with ACBL.

ACBL's liability for the loss in this case is also excluded under Clause 17 which clearly excludes liability for damage "resulting from and occasioned by ... Acts of God or the elements, river or lock outages, perils or accidents of the sea or other water." There is no genuine dispute that the loss in this case falls within the ambit of this exclusion. Indeed, J. Aron takes the position that this loss was due to an Act of God.

J. Aron contends that ventilation of the barges would have lessened the deterioration. Neither the bills of lading nor the contract of affreightment required ACBL to provide ventilated stowage or to man the barges. The contract of affreightment provides in Clause 14 that:

Loading of the barges shall constitute Shipper's acceptance of the condition and suitability of the barges for the intended cargo.

There is no evidence that J. Aron requested ACBL to ventilate the barges. Considering these undisputed circumstances, the court finds as a matter of law that notwithstanding the "Cargo Insured" bills of lading, ACBL did not accept the risk of loss in this case and that the loss is not covered by the parties' contract of affreightment.

### 2. *Harter Act*

J. Aron contends that ACBL's failure to ventilate the cargos violates its duty under the Harter Act to properly care for the cargos. The Harter Act governs common carriers engaged in marine transportation of "merchandise or property to or from any port in the United States." 46 U.S.C.App. § 192. In private carriage the Harter Act does not apply unless it is specifically invoked. *See Brown & Root, Inc. v. American Home Assurance Co.,* 353 F.2d 113, 118 (5th Cir.1965), *cert. denied,* 384 U.S. 943, 86 S.Ct. 1465, 16 L.Ed.2d 541 (1966). Neither ACBL's bills of lading nor its contract of affreightment in this case invoke the Harter Act. Thus, the applicability of the Harter Act turns on whether ACBL is a private or common carrier.

A common carrier is one that holds itself out to the public as ready to carry for anyone who requests its services, while a private carrier reserves the right to accept or reject employment as carrier. *See United States v. Stephen Bros. Line,* 384 F.2d 118, 122–23 (5th Cir.1967); *The Monarch of Nassau,* 155 F.2d 48 (5th Cir.1946); Carver's *Carriage By Sea* 4 (12th ed.1971). Where the carrier dedicates the full capacity of the vessel for the carriage of one shipper's cargo, it is presumed in the absence of other evidence, that the ship is a private carrier. *The Fri,* 154 F. 333, 338 (2nd Cir.1907), *cert. denied,* 210 U.S. 431, 28 S.Ct. 761, 52 L.Ed. 1135 (1908); *Pacific Vegetable Oil Corp. v. M/S Norse Commander,* 264 F.Supp. 625, 627 (S.D.Tex.1966); 2 A.E. Benedict, *Benedict on Admiralty* § 22, at 3–2 n. 1 (cases cited therein)(7th ed.1987). The rights and obligations of a private carrier are determined by the contract of affreightment which may include a bill of lading. Contrary to J. Aron's argument, issuance of a negotiable bill of lading does not signify common carriage. A negotiable bill of lading in private carriage serves as a receipt for cargo and as a document of title which also can by its terms vary the parties' risks. *See 2 Benedict on Admiralty* § 34 at 4–13.

In this case, the facts regarding the carriage are undisputed. ACBL submitted the uncontroverted affidavit of David Jahnke, Assistant Vice President of Grain and Logistics for ACBL, declaring that the tonnage reflected on each of the four bills of lading on the barges reflect the entire cargo on each barge, that no other tonnage or cargo belonging to any other shipper was contained in the barges, that the cargo in the four barges was transported in accordance with private contracts of affreightment referenced on the reverse side of each bill of lading, and that ACBL is a private carrier and reserves the right to accept or reject employment as a carrier and does not hold itself out to the public as ready to carry cargo for anyone who requests its services.

J. Aron argues that ACBL should be considered a common carrier because it filed tariffs. The evidence J. Aron submitted shows that ACBL filed two tariffs in 1977

and one in 1981. There is no evidence that these tariffs ever became effective and, if so, how long they remained in effect. Accordingly, J. Aron has failed to offer any genuine issue of material fact to show that ACBL filed a tariff applicable to this contract of carriage.

Considering the applicable law and the uncontroverted facts, the court finds as a matter of law that ACBL acted as a private carrier.

### 3. *Liability as Private Carrier*

The rights and obligations of a private carrier are determined by the contract of affreightment. As a private carrier, ACBL is bound only to exercise due care in the performance of its contract. The cargo interest bears the burden of establishing damage or loss resulting from a cause for which the carrier is liable. The cargo interest may establish a prima facie case against a private carrier by proof that the cargo was in good condition when it was received by the carrier and that it was delivered in worse condition. *Commercial Molasses Corp. v. New York Tank Barge Corp.,* 314 U.S. 104, 110, 62 S.Ct. 156, 86 L.Ed. 89 (1941). The carrier then bears the burden of explaining the cause of the loss or damage. *Id.* 314 U.S. at 111. If the court is unable to determine from the evidence whether the damage or loss resulted from a cause for which the private carrier is liable, the cargo interest will have failed to satisfy its ultimate burden of proving the private carrier's liability. *Id.* at 111, 114.

J. Aron fails to satisfy its initial burden of proof to show receipt of the cargo by ACBL in good condition. ACBL's bills of lading are not prima facie evidence that the cargos were loaded in good condition. The bills of lading state that "[u]nless otherwise indicated by endorsement hereon, the said shipment has been loaded by the shipper and the contents, quality, quantity, and condition of the shipment are unknown." The contract of affreightment also states in Article 11 "Carrier accepts bulk grain without knowledge of quantity or quality." There is no endorsement or description of the cargos in the bills of lading to indicate anything about

the quality or condition of the cargos. *See Cotia Steel v. M/V JAG VIDYA*, 1996 WL 194927 (E.D.La. April 19, 1996). As this case involves a private contract of carriage, the bills of lading were not required to describe the condition of the goods. *Compare* Carriage of Goods by Sea Act (COGSA), 46 U.S.C.App. § 1303(3)(c) and (4); Harter Act, 46 U.S.C.App. § 193. J. Aron did not submit any evidence other than the bill of lading to show loading in good condition. ACBL's expert report states that these cargos deteriorated due to mold and insect infestations that were present before loading and because grain moisture at loading favored mold growth. Considering these undisputed facts, the bill of lading is not prima facie evidence of receipt by the carrier of the cargos in good condition. *Compare Amstar Corp. v. S.S. Naashi*, 1978 A.M.C. 1845 (S.D.N.Y.1978) (citing *Spanish–Am. Skin Co. v. Ferngulf*, 143 F.Supp. 345 (S.D.N.Y.1956), *aff'd*, 242 F.2d 551 (2nd Cir.1957), and *George F. Pettinos, Inc. v. Thos. & Jno. Brocklebank, Ltd.*, 65 F.Supp. 102, 104 (E.D.Pa.1944)) (Where a bill of lading incorporates COGSA and contains the printed statement "weight, measure, quality, condition, contents and value unknown" together with a descriptive statement of the cargo, the bill of lading is prima facie evidence of receipt by the carrier of the goods as described); COGSA, 46 U.S.C.App. § 1303(4) and Harter Act, 46 U.S.C.App. § 193 (both Acts providing that the bill of lading shall be prima facie evidence of the receipt by the carrier of the goods as therein described).

Even if J Aron could establish a prima facie case, it fails to meet its ultimate burden of showing that the damage resulted from a cause for which ACBL is liable under the private contract of affreightment. *See* Part 1 of this opinion; *see In re Complaint and Petition of Int'l Marine Dev. Corp.*, 451 F.2d 763 (5th Cir.1971).

Accordingly,

IT IS ORDERED that J. Aron & Company's Motion for Partial Summary Judgment on the Issues of Liability against American Commercial Barge Line is **DENIED,** and American Commercial Barge Line Company's Motion for Summary Judgment is **GRANTED** dismissing all claims of plaintiff J. Aron & Company against defendant American Commercial Barge Line Company.